Filing # 133307732 E-Filed 08/24/2021 02:40:57 PM

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT**
**IN AND FOR PALM BEACH COUNTY, FLORIDA**
**CIVIL DIVISION**

NICHOLAS HEALY, *individually*
*and on behalf of allothers similarly*
*situated*,

          Plaintiff,

    v

HONORLOCK INCORPORATED,

          Defendant.

Case No.

## **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Nicholas Healy ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through undersigned counsel, brings this class action lawsuit for violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), against Defendant, Honorlock Incorporated ("Honorlock"). Plaintiff alleges the following facts based upon personal knowledge and/or the investigation of his counsel:

## **NATURE OF THE ACTION**

1.      Plaintiff brings this action for damages and other legal and equitable remedies resulting from the illegal actions of Honorlock in capturing, collecting, storing, and using Plaintiff's and other similarly situated individuals' biometric identifiers[1] and biometric

---

[1] A "biometric identifier" is defined as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10

information[2] (collectively, "biometrics") without first obtaining informed written consent or establishing publicly available biometric data retention and destruction policies, in direct violation of BIPA.

2.      Honorlock is an online test proctoring company that provides services for over 300 institutions serving over 1 million test-takers.[3]

3.      Honorlock's service is an online proctoring service that provides educational institutions with the ability to offer students a means of taking exams outside the classroom. Its system is built to "prioritize academic integrity" and the company is "continually innovating to hinder cheating."[4]  Put another way: the technology uses students' own computers to monitor them during remotely administered tests. The program is a cloud-based system that plugs into the Google Chrome web browser.

4.      In the spring of 2020, thousands of Illinois students were forced as a result of the COVID-19 pandemic, to take classes and tests from home. In response, many schools such as Plaintiff's contracted with third-party proctoring services, such as Defendant's, to administer exams. According to the Electronic Privacy Information Center, "[s]ince the start of the COVID-19 pandemic, educational institutions have rapidly accelerated their adoption of online test proctoring systems as part of the shift to remote learning."[5]

---

[2] "Biometric information" means "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10

[3] *Honorlock raises $25m*, https://news.crunchbase.com/news/exclusive-honorlock-raises-25m-for-online-exam-proctoring/ (last accessed August 5, 2021)

[4] https://honorlock.com/ (last accessed August 5, 2021)

[5] *In re Online Test Proctoring Companies*, https://epic.org/privacy/dccppa/online-test-proctoring/ (last viewed August 5, 2021)

5.      Contracts between Defendant and the schools required students to use Defendant's service in order to take the exams necessary to complete the semester (for which the students already paid tuition). Thus, students had—and have—no choice but to take their exams using Defendant's software.[6]

6.      Honorlock's software monitors students during their exams by collecting various items of information to safeguard against cheating. Its methods include collecting students' IP addresses and web activity, tracking students' web information through the use of cookies, and surveilling student activities using "a webcam video recording that includes desktop activity and audio recording."[7]

7.      But Honorlock's surveillance is more invasive than simply taking a video recording of the students. Honorlock scans facial geometry to verify the students' identities. A student must submit to a scan of his or her face via the computer's webcam and allow the software to compare this data to a scan of his or her photo ID.[8] Upon comparing the images, the software is able to conclude the student's image matches that provided in the identification card. *E.g.:*

---

[6] *25m*, https://honorlock.com/news/crunchbase-news-honorlock-raises-25m-for-online-exam-proctoring/ (last accessed August 5, 2021)

[7] https://honorlock.com/studentprivacy/ (last accessed August 5, 2021)

[8] *Honorlock pre-exam instructional video*, https://www.youtube.com/watch?v=6c56S6Nou8E (last viewed August 5, 2021)

3



*Figure 1*

*Figure 2*



*Figure 3*

*Figure 4*

8.      Not only does Honorlock's facial recognition software verify a student's identity,

but while the student is taking an exam Honorlock continuously monitors facial geometry by

detecting head movements and eye movements to determine whether the student is focused on

4

the computer screen.[9][10][11] Throughout the exam, Defendant's software also records and analyzes the student's voice using artificial intelligence that is sufficiently robust to detect specific words and flag suspicious behavior.[12]

9.   Defendant's collection of this data violates Illinois Law.   BIPA has strict requirements regarding what disclosures must be made and how consent must be obtained *before* collecting a user's biometrics.  Honorlock fails to provide the legally required disclosures to the user and fails to obtain written consent.  Honorlock also fails to meaningfully explain what biometrics are obtained, how the data is stored, and the specific purpose and length of term for which the data will be collected, stored, or used.

10.   Accordingly, Honorlock's conduct violates BIPA.

11.   In promulgating BIPA over a decade ago, the Illinois Legislature declared "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed.  Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *Id.*

---

[9] *AI Proctoring won't stop cheating*, http://thedailycougar.com/2020/09/24/ai-proctoring-cheating-added-stress/#:~:text=Because%20of%20this%2C%20schools%20and,%2C%20detection%2C%20and%20eye%20tracking. (last accessed August 5, 2021)

[10] https://honorlock.com/studentprivacy/ (last accessed August 5, 2021)

[11] *Honorlock: FAQ for students*, https://law.nova.edu/current-students/images-docs/honorlock-instr-n-faq.pdf (last accessed August 5, 2021)

[12] *Voice Detection – Faculty Guide*, https://www.apsu.edu/online/technology/files/honorlock_voice_detection.pdf (last accessed August 5, 2021)

12.     In recognition of these and other concerns over the security of individuals'

biometrics, the Illinois Legislature enacted BIPA, which provides, *inter alia*, that a private entity

– like Honorlock – *may not* obtain and/or possess an individual's biometrics unless it first

establishes a written and publicly-available retention schedule. 740 ILCS 14/15(a). Additionally,

it must also:

> "(1) inform the subject or the subject's legally authorized
> representative in writing that a biometric identifier or
> biometric information is being collected or stored;
>
> (2) inform the subject or the subject's legally authorized
> representative in writing of the specific purpose and length
> of term for which a biometric identifier or biometric
> information is being collected, stored, and used; and
>
> (3) receive a written release executed by the subject of the
> biometric identifier or biometric information or the subject's
> legally authorized representative."

740 ILCS 14/15(b). The entity is expressly prohibited from selling, leasing, trading, or otherwise

profiting from the individual's biometrics. 740 ILCS 14/15(c). Nor may the entity disclose,

redisclose, or otherwise disseminate an individual's biometrics absent written consent. 740 ILCS

14/15(d).

13.     Further, the entity must store, transmit, and protect an individual's biometric

identifiers and biometric information using the same standard of care in the industry and in a

manner at least as protective as the means used to protect other confidential and sensitive

information. 740 ILCS 14/15(e).

14.     In direct violation of BIPA, Honorlock is actively collecting, capturing, storing,

using, and profiting from the facial geometry, voiceprint, and associated personal identifying

information (including biometrics) of tens of thousands of students in Illinois, without providing

notice, obtaining informed written consent, or publishing adequate data retention policies.

15.     Plaintiff, on behalf of himself and the class as defined herein, brings this action to prevent Honorlock from further violating the privacy rights of citizens in the State of Illinois, and to recover statutory damages for Honorlock's unauthorized collection, capture, storage, and use of individuals' biometrics in violation of BIPA.

## JURISDICTION AND VENUE

16.     Defendant Honorlock is subject to the personal jurisdiction of this Court because it is headquartered in the State of Florida.  Pursuant to F.S.A. §48.193, Honorlock operates a business in the State of Florida, maintains an office in the state, and has transacted substantial business in the State of Florida, subjecting it to the general jurisdiction of the Courts within the State of Florida.

17.     Venue is proper in this County pursuant to F.S.A. §47.011 because Defendant's business is headquartered in this county and because Defendant stores within this county data collected in violation of BIPA.

## PARTIES

18.     Plaintiff Nicholas Healy is and has been at all relevant times, a resident and citizen of Illinois.  Plaintiff's encounter with Honorlock's face-scanning proctoring service occurred during an exam he took with Moraine Valley Community College.  Plaintiff's biometrics were collected in Illinois and stored in Florida.

19.     Defendant Honorlock, Inc. is a software company incorporated in Delaware and headquartered in Boca Raton, Florida.  Honorlock does business across the United States, including both Florida and Illinois.  Honorlock contracts with educational institutions to provide its online proctoring services and software for exams taken by students within the State of Illinois.

7

Specifically, Honorlock deploys an in-browser plugin on students' computers, via which Honorlock's AI monitors exam sessions and instructors receive recordings and incident reports.

## BACKGROUND

### I.    The Illinois Biometric Information Privacy Act

20.    In 2008, Illinois enacted BIPA due to the "very serious need for protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Req. Sess. No. 276.

21.    A "biometric identifier" is defined as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10.

22.    In turn, "biometric information" means "any information, regardless of how it is captured, converted, stored, or shared, based on an individuals' biometric identifier used to identify an individual." 740 ILCS 14/10.

23.    BIPA makes it unlawful for a company to, *inter alia*, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or customer's biometrics, unless it first:

> A. Informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;
>
> B. Informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> C. Receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

24.    Section 15(a) of BIPA also provides that:

> A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and

> guidelines for permanent destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first. Absent a valid warrant or subpoena issued by a court of competent jurisdiction, a private entity in possession of biometric identifiers or biometric information must comply with tis established retention schedule and destruction guidelines.

*Id.*at 14/15(a).

25.     Further, BIPA prohibits a "private entity in possession of a biometric identifier or biometric information from sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from a person's or a customer's biometric identifier or biometric information." 740 Ill. Comp. Stat. Ann. 14/15(c).

26.     Nor may a private entity "disclose, redisclose, or otherwise disseminate an individual's biometrics absent written consent." 704 ILSC 14/15(d).

27.     Finally, BIPA places significant security requirements on private entities that acquire individuals' biometrics, stating that they must: "(1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmit, and protects other confidential and sensitive information." 740 ILCS 14/15(e).

## II.     Honorlock's BIPA-Violative Conduct

### A.     Honorlock's Use of Facial Detection, Facial Landmark Detection, and Facial Recognition.

#### i.   Facial Detection, Generally

28.     Facial detection "is the first and essential step for face recognition," and is used as a preliminary step to detect faces in images. It is a part of object detection and is used in many

areas, including biometrics.[13] Facial detection "is used to detect faces in real time for surveillance and tracking of [a] person or objects."[14]

29.     Specifically, facial detection technology uses algorithms and machine learning to find human faces within larger images.[15] Facial detection algorithms start by scanning the collected image for human eyes – one of the easiest features to detect. The algorithm then attempts to detect eyebrows, the mouth, nose, nostrils and the iris.[16] *E.g.*



*Figure 5*[17]

30.     Once the algorithm classifies a sufficient number of data points in the scanned face as belonging to a face (i.e., eyes, mouth, nose, nostrils, and iris), it applies additional tests to

---

[13] *See,* Divyanch Dwivedi, *Face Detection for Beginners*, Towards Data Science (available at https://towardsdatascience.com/face-detection-for-beginners-e58e8f21aad9) (last accessed August 5, 2021)

[14] *Id.*

[15] *See, generally*, Corrine Bernstein, *Face Detection*, Search Enterprise AI (available at https://searchenterpriseai.techtarget.com/definition/face-detection) (last accessed August 5, 2021)

[16] *Id.*; *see, also*, OpenCV, *Cascade Classifier*, (available at https://docs.opencv.org/3.4/db/d28/tutorial_cascade_classifier.html) (last accessed August 5, 2021)

[17] Keval Dohsi, *Face Detection using Raspberry Pi and Smartphone*, Hackster.io (available at https://www.hackster.io/keval-doshi/face-detection-using-raspberry-pi-and-smartphone-19f1f2) (last accessed August 5, 2021)

confirm that it has, in fact, detected a face.[18]



*Figure 6*[19]

31.     Once trained, the model extracts specific features, which are then stored in a file so that features from new images can be compared with the previously stored features at various stages. If the image under study passes through each stage of the feature comparison, then a face has been detected and operations can proceed.[20]

### ii.  Face Detection As Used By Honorlock

32.     The above-described procedures generally rely on the early technologies of "Principal Component Analysis" and "Linear Discriminate Analysis" which seek to locate specific data points in an image, and then compare those data points to each other in order to classify those data points as belonging to various features of a face (i.e. eyes, nose, cheeks)."[21]

> "Face detection algorithm is to find out the coordinate system of all faces in one image. This is the process of scanning the entire image to determine whether the candidate area is a face. The output of the

---

[18] *See, generally*, Bernstein, *Face Detection*, fn 8, *supra*.

[19] OpenCV, *Cascade Classifier*, fn 9, *supra*.

[20] *See, generally*, Bernstein, *Face Detection*, fn 8, *supra*.

[21] *See*, Liaxiang, *A Review of Face Recognition Technology*, IEEE Access (available at https://ieeexplore.ieee.org/abstract/document/9145558) (last accessed August 5, 2021)

face coordinate system can be square, rectangular, etc. The face position is the coordinate position of the face feature in the face detection coordinate system."[22]

Use of this technology is critical for technology called "gaze detection," which is used to recognize behavior that resembles cheating by, for example, tracking the students' eyes to determine whether they are pointed at the screen or elsewhere.[23][24] Like facial detection more broadly, facial landmark detection necessarily relies on expansive collection of facial data points (i.e, facial geometry), and analysis of same in order to divine unique attributes of the scanned individual:



Facial Landmark Detection Output

Figure 7[25]

---

[22] *Id.*

[23] Daily Cougar, *AI won't stop students, supra*

[24] Nova, *FAQ, supra*

[25] *See,* Oluwatosin, *Facial Landmarks and Face Detection in Python with OpenCV,* fn. 7, https://medium.com/analytics-vidhya/facial-landmarks-and-face-detection-in-python-with-opencv-73979391f30e (last accessed August 5, 2021)



Zoomed output

*Figure 8*

### iii.    Honorlock Admits That Its Technology is Used for Facial Detection and Facial Recognition

33.    Despite the statement on its website denying the use of facial recognition, Honorlock purports to engage in facial recognition when students login and initiate the exam precheck procedures. As can be seen in *Figure 1*, Honorlock clearly indicates to students that "facial recognition is in progress."

34.    But even if Honorlock does not engage in facial recognition, its website still purports to be BIPA violative when it readily admits the exam proctoring service "uses facial *detection* which only detects that there is a clear human face in the webcam" for the purpose of identity verification and exam integrity.

35.    The basis of face detection technology includes the collection of face geometry through the processes of Principal Component Analysis (*i.e.*, feature face extraction), and Linear Discriminate Analysis (i.e. labeling data sets corresponding to facial features).[26]    Thus,

---

[26] *See*, Liaxiang, *supra*

13

Honorlock's public statements pertaining to its practices purport to violate BIPA through the collection of biometrics in the form of face geometry.

36.     Combining Honorlock's admission to using facial detection, its reliance on facial detection technology which measures whether a student is looking at the screen during an exam, and its pre-test procedures which inform students that "facial recognition" is used to verify a student's identity gives rise to the reasonable inference that Honorlock's denial of using facial recognition on its website (and instead using facial detection) is a distinction without a legal difference for purposes of BIPA. Indeed, Honorlock's own interface describes its face-scanning as "facial recognition." *See, Figure 1, supra.*

### B. Honorlock's Application of Its Facial-Geometry-Scanning Software In the Proctoring Context

37.     Prior to beginning any exam proctored using the Honorlock software, a student must first install the extension on his Chrome browser. At no point during the installation process is a student presented with any of the information required to be provided under BIPA.

38.     A student enrolled in an institution that uses Honorlock's online proctoring services and software has no reasonable alternative but to use Honorlock when taking an online exam. As noted above, as a result of coronavirus shutdowns, educational institutions began mandating students take classes and exams online. Thus, at all relevant times hereto, students were presented with the false choice of using Honorlock's online proctoring services and software or receiving a failing grade for the course and foregoing thousands of dollars in tuition.

39.     Immediately prior to a student's taking an exam and continuing throughout the exam - and without first obtaining the student's written consent - Honorlock employs its software to scan and monitor the student's face. Honorlock's biometric-scanning technology first identifies the student's face and checks it against the face in her ID (*see, Figures 1-4, supra*), and it then

14

continues to use face detection[27] and eye-tracking[28] throughout the exam for a multitude of purposes, including to see if a test taker's face is clearly visible in the computer's camera, to determine if another person enters the room, or to determine if the test-taker has left the exam. Honorlock also uses a "robust voice detection" system which takes a recording of the audio during the exam and is capable of detecting specific words and flagging them (i.e., "Hey Siri").[29]

40.     Nothing in the exam pre-launch procedures provides notice that biometrics are being collected and stored or how they are used, and the student is not requested to provide a written release of his or her biometrics.[30]  When a student activates the web extension to begin an exam, she is presented with the following notices:

---

[27] Daily Cougar, *supra*

[28] Swauger, *Software that monitors students violates privacy*, https://www.technologyreview.com/2020/08/07/1006132/software-algorithms-proctoring-online-tests-ai-ethics/ (last accessed August 5, 2021)

[29] *Honorlock New AI to Detect Keywords Spoken*, https://honorlock.com/news/press-release-honorlock-announces-new-ai-to-detect-keywords-spoken-by-students-during-online-exams/ (last accessed August 5, 2021)

[30] *How to Use Honorlock*, https://honorlock.kb.help/-students-starting-exam/how-to-use-honorlock-student/ (last accessed August 5, 2021)



*Figure 9*

41.     As discussed above, Honorlock's software obtains the student's biometrics by, *inter alia*, scanning the student's facial geometry using facial detection/recognition. Critically, these scans are obtained without satisfying the BIPA requirement of notice that biometrics are being collected and the specific purpose and length of time the data will be collected, stored, and used,[31] or obtaining a written release from the student or his or her authorized representative. A screenshot of the scanning process looks like this:

_____

[31] *Id.* (last viewed August 5, 2021)





*Figure 10*                    *Figure 11*

42.     The student is then required to submit his or her photo identification which is verified against the initial face scan and authenticates that the student taking the exam is the same as the person as depicted on the submitted photo identification:

 

*Figure 12*                          *Figure 13*

43.     Honorlock's Terms of Service[32] and Privacy Policy[33] in operation at the time Plaintiff was required to submit to its technology failed to put a student on notice of Honorlock's biometric-scanning practices because neither document mentions the acquisition of biometric data and, thus, cannot form the basis of informed written consent, as required under BIPA.[34] Honorlock's Privacy Policy in operation until May of 2021 provided the following warnings, as can be found in Exhibit A, and which reads in pertinent part:

---

[32] Honorlock Terms of Service

[33] Honorlock Privacy Policy, Exhibit A

[34] Plaintiff's experience occurred in 2020 and thus, this suit is based on the language of the privacy policy in effect at that time. Honorlock updated the language in its privacy policy related to use of its application in May of 2021.

18

"**The Information We Collect and Receive**

In the course of operating the App, we will collect (and/or receive) the following types of information. You authorize us to collect and/or receive such information.

1. Personal Information

   When Students and Authorized Users login to a School's LMS and install the Honorlock Chrome extension, they are asked to provide us with certain personal information. This personal information may include your first and last name, email address, LMS user ID, and, with respect to Students, all Authentication Data (including personal information contained on a Student's photo ID, such as driver's license number, home address, date of birth, and other information).

   The personal information described in this section is referred to collectively as "Personal Information". The Personal Information is used to provide the Services (including to perform Authentication), and to contact you as needed in connection with the Services or for purposes of direct marketing of our Services. We do not collect any Personal Information from Students or Faculty unless they provide such information voluntarily."

*See* Exhibit A.

44. Thus, nothing in this Privacy Policy even mentions the collection of biometric identifiers or biometric information, much less any information which could provide a basis for Plaintiff and class members to provide informed written consent to the collection of biometrics.

45. Honorlock's Privacy Policy is further BIPA-violative, in that it seeks to allow Honorlock to sell students' biometrics. *E.g.*, Honorlock's Privacy Policy states, in relevant part:

> A. "all of the information that we collect and/or receive pursuant to this App Privacy Policy, including Personal Information, Device Information, and Activity information described above, is referred to collectively herein as "Information…We may share your Information as described below in accordance with applicable law."

19

B. "We may share this aggregate data with our affiliates, agents, business partners, and third parties. We may also disclose aggregated user statistics in order to describe our products and Services to current and prospective business partners and to other third parties for lawful purposes."

C. "We may employ other companies and individuals to perform functions on our behalf...These other companies will have access to the information only as necessary to perform their functions and to the extent permitted by law."

D. "In the event of a corporate sale, merger, reorganization, sale of assets, dissolution, or similar event, the Information may be part of the transferred assets."

46. Honorlock's business model is fundamentally based on its acquisition of biometric identifiers and biometric information from students. It markets and advertises its product with a heavy emphasis on its ability to monitor students during exams to detect cheating, and further uses this information in an attempt to set itself apart from competitors. The practice of selling a product based on its illegal acquisition of biometric identifiers is a clear violation of BIPA's prohibition against profiting from biometric identifiers and biometric information.

47. By mandating use of Honorlock's online proctoring software and, in turn, the collection of a student's biometric information without first getting voluntary, informed consent, Honorlock and its institutional counterparts subjected students to coercive acts that deprived students of their free will. With no reasonable alternative, Plaintiff and the members of the Class succumbed to Honorlock's collusive and coercive acts.

**B. Plaintiff's Experience**

48. Plaintiff was required to use Honorlock's software beginning January 2021. Plaintiff did not voluntarily accept the terms associated with use of Honorlock's online proctoring software, but was instead forced to use Honorlock or face the threat of receiving a zero on the

20

exam and, in turn, failing the course, which would undermine his ability to receive a diploma and result in the forfeiture of thousands of dollars in tuition.

49.     Plaintiff is an Illinois resident who used Honorlock's software while in the state of Illinois.  Honorlock had full knowledge of Plaintiff's location because Honorlock identifies students' physical locations[35] in the ordinary course of its business.

50.     During the exam, Plaintiff was required to undergo Honorlock's scanning procedures in a manner substantially similar – if not identical – to the processes set forth in paragraphs 37-45.

51.     In so doing, Defendant's technology scanned, captured, and collected Plaintiff's facial geometry – along with other biometrics – and stored this data.

52.     Defendant did not inform Plaintiff in writing that it was capturing and collecting his biometrics, the purpose and length of time for such collection, nor did Defendant obtain Plaintiff's written consent before capturing his biometrics.  Plaintiff never consented, agreed, or gave permission – written or otherwise – to Defendant for the collection or storage of Plaintiff's biometrics.

53.     In point of fact, even assuming arguendo Plaintiff *had* provided consent – which he did not – it would not be sufficient pursuant to BIPA.  As Plaintiff is a student who was required to take his exams online and required to use the Honorlock software to do so, he could never have given sufficient consent regardless of what disclosures were provided.  Plaintiff and other students using Honorlock's software, who had already paid tuition for their semester and invested valuable hours in and out of the classroom for their classes, were faced with either providing their biometrics to Honorlock or taking a zero on each exam and losing out on college credit for which

---

[35] https://honorlock.com/studentprivacy/

they had already substantially performed their duties and obligations and paid large sums of money in tuition to obtain. Put differently, Plaintiff was given no choice in any meaningful sense as there was only one realistic option. Thus, any purported consent was obtained involuntarily and under duress or undue influence.

54. Likewise, Defendant never provided Plaintiff the requisite statutory disclosures nor an opportunity to prohibit or to prevent the collection, storage, or use of his biometrics.

55. Defendant purports to reserve the right to disclose Plaintiff's biometrics, in direct contravention of BIPA.

56. By collecting his biometrics without Plaintiff's voluntary and informed consent, Defendant invaded Plaintiff's statutorily protected right to privacy in his biometrics.

## CLASS ALLEGATIONS

57. Plaintiff brings this action pursuant to Fla. R. Civ. P. Rule 1.220 *et seq.,* on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals who are Illinois residents and had their
> biometrics collected, captured, received, or otherwise
> obtained by Defendant.

58. **Numerosity**: Pursuant to Fla. R. Civ. P. 1.220(a) the number of persons within the Class is substantial, believed to amount to tens of thousands of persons or more. It is, therefore, impractical to join each member of the Class as a named Plaintiff. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

59. **Commonality and Predominance**: Pursuant to Fla. R. Civ. P. 1.220(a) there are well-defined common questions of fact and law that exist as to all members of the Class and that

predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any class member include, but are not limited to, the following;

      A. Whether Defendant captured, collected, or otherwise obtained Plaintiff's and the Class's biometrics;

      B. Whether Defendant properly informed Plaintiff and the Class that it captured, collected, used, and stored their biometrics;

      C. Whether Defendant obtained a written release to capture, collect, use, and store Plaintiff's and the Class's biometrics;

      D. Whether Defendant sells, leases, trades, or profits from Plaintiff's and the Class's biometrics;

      E. Whether Defendant discloses, rediscloses, or otherwise disseminates Plaintiff's and the Class's biometrics absent consent; and

      F. Whether Defendant's violations of BIPA were committed intentionally, recklessly, or negligently.

60. **Typicality**: Plaintiff's claims are typical of those of the members of the Class because Plaintiff, like all members of the Class, used Honorlock to take an online exam, and had his biometrics recorded and improperly stored by Defendant in violation of BIPA.

61. **Adequate Representation**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex privacy class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of such a Class. Neither Plaintiff nor his counsel have any interest adverse to or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims of the type reasonably expected

23

to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class or additional claims as may be appropriate.

62.     **Superiority**: Pursuant to Fla. R. Civ. P. 1.220(b)(3) a class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable. Even if every member of the Class could afford to invest the time and expense necessary to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court stem resulting from multiple trials of the same factual and legal issues. By contrast, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. As Class members suffer similar consequences under similar circumstances, it is unlikely individual members of the Class will display great interest in controlling separate claims or defenses, and there is currently no pending litigation in which any question of law or fact in this subject action is to be adjudicated. Moreover, this litigation is preferably managed in the current forum due to the location of Defendant's headquarters in this county. Class-wide relief is essential to compliance with BIPA.

## CLAIMS FOR RELIEF

**COUNT I**
**VIOLATION OF 740 ILCS 14/15(a)**
*Failure to Develop Public Written Retention*
*Schedule and Destruction Guidelines*

63.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

64.     Defendant, Honorlock, is a private entity as contemplated by BIPA.

65.     Defendant engages in the collection of biometric identifiers and biometric information as part of the online-proctoring services it provides to educational institutions.

66.     BIPA requires a private entity engaged in the capture, collection, storage, and use of biometric identifiers or biometric information to develop a publicly available written retention schedule and guidelines for the destruction of biometric identifiers and information. The schedule must inform subjects whose biometrics are collected that their data will be retained only until (i) the initial purpose for which the collection of such identifiers or information has been satisfied or (ii) within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a).

67.     Honorlock failed to provide a publicly available retention schedule and destruction guidelines anywhere on its website or its Terms of Service or Privacy Policy during the Class Period.

68.     By collecting Plaintiff's and the Class members' biometrics without having provided them the opportunity to view Defendant's public-facing documents regarding its collection, retention, and destruction of their biometrics, Honorlock violated BIPA.

69.     On behalf of himself and the Class, Plaintiff seeks (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, use and dissemination of biometrics as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA or, in the alternative, statutory damages of $1,000

for each negligent violation of BIPA; and (4) reasonable attorneys' fees and costs and other litigation expenses. *See* 740 ILCS 14/20.

**COUNT II**
**VIOLATION OF 740 ILCS 14/15(b)**
***Failure to Obtain Informed Written Consent***
***and release before Obtaining Biometrics***

70.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

71.     BIPA requires companies to obtain informed written consent from a person or customer before acquiring his or her biometric data.  Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first: (1) informs the subject…in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject…in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; **and** (3) receives a written release executed by the subject of the biometric identifier or biometric information…" 740 ILCS 14/15(b) (emphasis added).

72.     Defendant fails to comply with these BIPA mandates.

73.     Defendant systematically and automatically collected, used, stored, and disseminated Plaintiff's and the Class's biometrics in the form of face geometry and facial recognition without first obtaining the written release required by 740 ILCS 14/15.

74.     Defendant never informed Plaintiff and the Class in writing that their biometrics were being collected, stored, used, and disseminated, nor did Defendant inform Plaintiff and the Class in writing of the specific purpose(s) and length of term for which their face geometry biometrics were being collected, stored, used, and disseminated, nor did Defendant obtain a

26

written release executed by Plaintiff and the Class or their legally authorized representatives as required by 740 ILCS 14/15.

75. By collecting, storing, using, and disseminating Plaintiff's and the Class's biometrics absent informed consent and written release as described herein, Defendant violated Plaintiff's and the Class's rights to privacy in their biometrics as set forth in BIPA. *See* 740 ILCS 14/1, *et seq.*

76. On behalf of himself and the Class, Plaintiff seeks (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, use and dissemination of biometrics as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA; and (4) reasonable attorneys' fees and costs and other litigation expenses. *See* 740 ILCS 14/20.

**COUNT III**
**VIOATION OF 740 ILCS 14/15(c)**
***Selling, Leasing, Trading, or Otherwise Profiting From***
***a Person's or a Customer's Biometrics***

77. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78. BIPA expressly prohibits a "private entity in possession of a biometric identifier or biometric information" from "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from a person's or a customer's biometric identifier or biometric information." 740 Ill. Comp. Stat. Ann. 14/15(c).

79.     As detailed herein, not only does Honorlock explicitly profit from the biometrics

of Plaintiff and Class members, it further reserves the right to sell such information at its

discretion, in direct contravention of the protections set forth in BIPA.

80.     On behalf of himself and the Class, Plaintiff seeks (1) declaratory relief; (2)

injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by

requiring Defendant to comply with BIPA's requirements for the collection, storage, use and

dissemination of biometrics as described herein; (3) statutory damages of $5,000 for each

intentional and/or reckless violation of BIPA or, in the alternative, statutory damages of $1,000

for each negligent violation of BIPA; and (4) reasonable attorneys' fees and costs and other

litigation expenses. *See* 740 ILCS 14/20.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of himself and the proposed Class, respectfully requests

that this Court enter an Order;

- A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing his counsel as Class Counsel;

- B. Declaring that Defendant's actions, as set out above, violate BIPA, 740 ISCS 14/1, *et seq.*;

- C. Awarding statutory damages of $5,000.00 for each and every intentional and reckless violation of BIPA, or alternatively, awarding statutory damages of $1,000.00 for each and every negligent violation of BIPA;

- D. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an Order requiring Defendant to comply with BIPA;

- E. Awarding Plaintiff and the Class their reasonable attorneys' fees and costs and other litigation expenses;

28

F.  Awarding Plaintiff and the Class pre-and post-judgement interest, to the extent allowable; and

G.  Awarding such other and further relief as equity and justice my require.

Dated: August 24, 2021

/s/ Louis I. Mussman

**KU & MUSSMAN, P.A.**
Louis I. Mussman, Esq.
FL Bar #: 597155
Brian T. Ku, Esq.
FL Bar # 610461
18501 Pines Blvd. Suite 209-A
Pembroke Pines, Florida 33029
Telephone:  (305) 891-1322
Facsimile:  (954) 686-3976

**CARNEY BATES & PULLIAM, PLLC**
Randall K. Pulliam (*pro hac vice forthcoming*)
rpulliam@cbplaw.com
David Slade
dslade@cbplaw.com
Samuel R. Jackson
sjackson@cbplaw.com
519 W. 7th Street
Little Rock, AR  72201
(501) 312-8500

*Attorneys for Plaintiff and the Proposed Class*

# EXHIBIT A

## APPLICATION PRIVACY POLICY

### Effective as of March 20, 2020

This App Privacy Policy relates to the information collection and use practices of Honorlock in connection with our App. This App Privacy Policy applies to information collected from and about both Students and Authorized Users. BY ACCESSING AND USING THE APP, YOU ARE ACKNOWLEDGING THAT YOU HAVE READ, UNDERSTOOD, AND AGREE TO BE LEGALLY BOUND BY THIS APP PRIVACY POLICY AND THE TERMS OF SERVICE APPLICABLE TO YOU AS EITHER A STUDENT OR AUTHORIZED USER (EACH, A "TERMS OF SERVICE"). LINKS TO BOTH STUDENT AND AUTHORIZED USER TERMS OF SERVICE ARE FOUND AT https://honorlock.com/legal/student AND https://honorlock.com/legal/faculty. THE TERMS OF SERVICE APPLICABLE TO YOU ARE HEREBY INCORPORATED INTO THIS APP PRIVACY POLICY, AND, TOGETHER WITH THIS APP PRIVACY POLICY, CONSTITUTE THE STUDENT OR AUTHORIZED USER AGREEMENT RESPECTIVELY. IF YOU DO NOT AGREE TO ANY OF THE TERMS IN THE STUDENT OR AUTHORIZED USER AGREEMENT, YOU MAY NOT ACCESS OR USE THE APP.

Capitalized terms not defined in this App Privacy Policy shall have the meaning set forth in the Terms of Service applicable to you.

### GDPR & Privacy Shield Notice

Natural persons located in the European Economic Area should review the General Data Protection Regulation (**"GDPR"**) & Privacy Shield Notice https://honorlock.com/legal/gdpr_privacy. The term "European Economic Area" shall be as defined in such notice.

### The Information We Collect and Receive

In the course of operating the App, we will collect (and/or receive) the following types of information. You authorize us to collect and/or receive such information.

1.      Personal Information

When Students and Authorized Users login to a School's LMS and install the Honorlock Chrome extension, they are asked to provide us with certain personal information. This personal information may include your first and last name, email address, LMS user ID, and, with respect to Students, all Authentication Data (including personal information contained on a Student's photo ID, such as driver's license number, home address, date of birth, and other information).

The personal information described in this section is referred to collectively as "Personal Information". The Personal Information is used provide the Services (including to perform Authentication), and to contact you as needed in connection with the Services or for purposes of direct marketing of our Services. We do not collect any Personal Information from Students or Faculty unless they provide such information voluntarily.

2.      Device Information

In order to perform the Services, including, without limitation, the Authentication, we collect information about Students' Primary Devices and, if applicable, Secondary Devices. We may also collect information about the devices being used by Authorized Users. Information about devices may include type of device, operating system and version (e.g., iOS, Android or Windows), carrier and country location, network type (WiFi, 3G, 4G, LTE), and other related device information (collectively, "Device Information"). We use the Device Information in connection with Authentication, and to provide the Services, including, without limitation, to detect Student misconduct when taking Exams.

3.      Activity Information

In an ongoing effort to improve the App, we automatically collect certain information when you use the App. This information consists of IP addresses, browser type and language, referring and exit pages and URLs, date and time, amount of time spent on particular pages, and similar information concerning your use of the App. We also collect information using "cookie" technology. Cookies are small packets of data that a server stores on the hard drive of your computer or mobile device to "remember" information about your visit. We may use session cookies (which expire once you close your web browser) and persistent cookies (which stay on your computer/device until you delete them). If you do not want us to place a cookie on your hard drive, you may be able to turn that feature off on your computer or mobile device. Please consult your Internet browser's documentation for information on how to do this and how to delete persistent cookies. However, if you decide not to accept cookies from us, the App may not function properly. The information described in this paragraph is referred to as "Activity Information."

If you communicate with Honorlock or any of our Proctors via live chat or email, we collect information provided in such communications. This may include chat transcripts. In addition, the App records almost all Student activity including, without limitation, video recorded from the Student's Primary Device web camera, recordings of a Student's screen activity from his or her Primary Device, and recordings of a Student's search and screen activity from his or her Secondary Device in connection with our Secondary Device Detection feature. The information described in this paragraph is referred to as "Records," which are a form of Activity Information.

Some Records are collected on our behalf by third-party service providers. We currently employ the services of Inspectlet to record Secondary Device activity, but we reserve the right to use other service providers from time to time without notice. Inspectlet only provides this activity to us in anonymous format.    You may review Inspectlet's privacy policy and terms of use at https://www.inspectlet.com/legal. Notwithstanding the foregoing, our technology is able to match this anonymous activity back to a particular Student based on several factors including the Student's location, the time the Student commenced the Exam in question, and the specific question(s) on the Exam that were searched.

**How We Use and Share the Information**

All of the information that we collect and/or receive pursuant to this App Privacy Policy, including Personal Information, Device Information, and Activity Information described above, is referred to collectively herein as "Information." We use the Information to provide you access to and use of the App, to provide the Services to Students, assure the quality of our Services, Instructors, and Schools, solicit your feedback, and to inform you about our products and services. We may share your Information as described below in accordance with applicable law.

- We may share your Information with the School with which you are affiliated, and only to the extent necessary to perform the Services. It is the School's obligation to comply with all applicable laws, rules, and regulations with respect to your Information.

- In an ongoing effort to better understand our users and our App, we might analyze the Information in aggregate, anonymous form in order to operate, maintain, manage, and improve the App, and for benchmarking purposes. This aggregate information does not identify any individual personally. We may share this aggregate data with our affiliates, agents, business partners, and third parties. We may also disclose aggregated user statistics in order to describe our products and Services to current and prospective business partners and to other third parties for other lawful purposes.

- We may employ other companies and individuals to perform functions on our behalf. Examples may include Inspectlet for providing Secondary Device activity detection and recording, and other third parties to provide marketing assistance, billing and payment processing, and customer service. These other companies will have access to the Information only as necessary to perform their functions and to the extent permitted by law.

- In the event of a corporate sale, merger, reorganization, sale of assets, dissolution, or similar event, the Information may be part of the transferred assets.

- We may also disclose Information when required by law, court order, or other government or law enforcement authority or regulatory agency, or whenever we believe that disclosing such information is necessary or advisable, for example, to protect the rights, property, or safety of Honorlock or others, to the extent permitted by law.

We will take reasonable measures to require that the party receiving any of your Information undertakes to: (i) retain and use such information only for the purposes set out in this App Privacy Policy; (ii) not disclose your Information except with your consent, as permitted by law, or as permitted by this App Privacy Policy; and (iii) generally protect the privacy of your Information.

**How We Protect Your Information**

We take commercially reasonable steps to protect the Information from loss, misuse, and unauthorized access, disclosure, alteration, or destruction. Please understand, however, that no security system is impenetrable. We cannot guarantee the security of our databases, nor can we guarantee that the information you supply will not be intercepted while being transmitted to and from us over the Internet.

For example, your Information is subject to data input limitations, media file process monitoring, restricted access, and other process integrity controls. We are committed to the availability of our App through continuous monitoring of our systems. Further, we are committed to protecting your Information through our SOC 2 compliant policies and procedures.

## Retention of Personal Information

We will retain your personal information in a form that identifies you only for as long as it serves the purpose(s) for which it was initially collected as stated in this App Privacy Policy, subsequently authorized, or as allowed under applicable law.

## Accessing and Modifying Contact Information and Communication Preferences

You may make changes to your contact information by contacting us at privacy@honorlock.com or by following instructions on the App. In addition, you may manage your receipt of marketing and non-transactional communications by clicking on the "Unsubscribe" link located on the bottom of any Honorlock marketing email. We will use commercially reasonable efforts to process such requests in a timely manner. You cannot opt out of receiving transactional or administrative e-mails related to the Services.

## Important Notice to Non-U.S. Residents

The App and our servers are operated in the United States. Please be aware that your Information may be transferred to, processed, maintained, and used on computers, servers, and systems located outside of your state, province, country, or other governmental jurisdiction where the privacy laws may not be as protective as those in your country of origin. Except in the case of data transfers under the EU-US Privacy Shield Framework and the Swiss-U.S. Privacy Shield Framework, your decision to provide such data to us, or allow us to collect such data through the App, constitutes your consent to this data transfer.

## How We Protect Your Personal Information under the Privacy Shield

Honorlock takes very seriously the security and privacy of the personal information that it collects pursuant to the Privacy Shield. Accordingly, we will implement reasonable and appropriate security measures to protect your personal information from loss, misuse and unauthorized access, disclosure, alteration and destruction, taking into account the risks involved in processing and the nature of such data, and comply with applicable laws and regulations.

## California Residents

Under California Civil Code Section 1798.83, California residents who have an established business relationship with Honorlock may choose to opt out of our sharing their Information with third parties for direct marketing purposes. If you are a California resident and (1) you wish to opt out; or (2) you wish to request certain information regarding our disclosure of your Information to third parties for the direct marketing purposes, please send an e-mail to privacy@honorlock.com.

In addition, Honorlock does not monitor, recognize, or honor any opt-out or do not track mechanisms, including general web browser "Do Not Track" settings and/or signals.

## External Websites

The App may contain links to third-party websites. Honorlock has no control over the privacy practices or the content of any of our business partners, advertisers, sponsors, or other websites to which we provide links. As such, we are not responsible for the content or the privacy policies of those third-party websites. You should check the applicable third-party privacy policy and terms of use when visiting any other websites.

**Changes to This App Privacy Policy**

This App Privacy Policy is effective as of the date stated at the top of this App Privacy Policy. We may change this App Privacy Policy from time to time, and will notify you of such changes (e.g., posting any changes on the App, e-mailing you, or prompting you via a popup). By accessing and using the App after we notify you of such changes to this App Privacy Policy, you are deemed to have accepted such changes. Please refer back to this App Privacy Policy on a regular basis.

**How to Contact Us**

If you have questions about this App Privacy Policy, please e-mail us at privacy@honorlock.com.